# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BUILDING TRADES UNITED PENSION
TRUST FUND, MILWAUKEE AND SOUTHERN
WISCONSIN DISTRICT COUNCIL OF CARPENTERS
HEALTH FUND, MILWAUKEE AND SOUTHERN
WISCONSIN DISTRICT COUNCIL OF
CARPENTERS VACATION FUND, MILWAUKEE
CARPENTERS JAC FUND, IAP/CA FUND,
MARK SCOTT and NACARCI FEASTER,

        Plaintiffs,

        v.                        Case No. 06-C-0060

ESPERANZA UNIDA, INC.,

        Defendant.

---

## DECISION AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ON PLAINTIFFS' MOTION TO STRIKE

---

### I. PROCEDURAL BACKGROUND

The plaintiffs, Building Trades United Pension Trust Fund, Milwaukee and Southern

Wisconsin District Council of Carpenters Health Fund, Milwaukee and Southern Wisconsin District

Council of Carpenters Vacation Fund, Milwaukee Carpenters JAC Fund, IAP/CA Fund, Mark Scott,

and Nacarci Feaster (collectively, "the Funds"), filed a complaint on January 13, 2006 alleging that

the defendant, Esperanza Unida, Inc. ("EU"), failed to make fringe benefit contributions for audited

periods through August 19, 2005 and for unknown unaudited amounts thereafter.  Furthermore, the

Funds allege that as a result of these delinquent contributions, EU is liable for liquidated damages

and interest, and attorney's fees and costs.  The Funds base these claims upon section 301 of the

Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("LMRA"), and section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 ("ERISA").

Currently pending before the court is the plaintiffs' motion for summary judgment, as well as the plaintiffs' motion to strike the defendant's affirmative defenses. Both motions are fully briefed and ready for resolution. For the reasons which follow, the plaintiffs' motion for summary judgment will be granted.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the plaintiffs' motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the defendant's response to the plaintiffs' motion for summary judgment contained some additional proposed findings of fact. However, the defendant did not submit responses to the plaintiffs' proposed findings of fact. Consequently, the court must conclude that there is no genuine material issue as to the plaintiffs proposed findings of fact. *See* Civil Local R. 56.2(e). A review of the parties' respective proposed findings reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the plaintiffs' motion for summary judgment.

The Funds are multi-employer employee benefit plans within the meaning of ERISA §§ 3(1), (2), (3), and (37), 502, and 515 (29 U.S.C. §§ 1102(1), (2), (3), and (37), 1132, and 1145) and section 302(c)(5) of the LMRA (29 U.S.C. §186(c)(5)). (Plaintiffs' Proposed Findings of Fact (PPFOF ¶ 3.) The plaintiffs, Mark Scott and Nacarci Feaster, are two of the Funds trustees and fiduciaries. (PPFOF ¶ 4 and 5.)

The Funds are jointly administered and governed by a Board of Trustees ("Trustees") consisting of an equal number of union and employer appointees, as provided by section 302(c)(5)

Case 2:06-cv-00060-WEC   Filed 11/14/06   Page 2 of 24   Document 61

of the LMRA (29 U.S.C. §186(c)(5)). (PPFOF ¶ 6.) The Funds collect contributions from employers and distribute the monies for the workers' retirement, health, training, and vacation benefits. (PPFOF ¶ 7.)

EU is a Wisconsin corporation that was engaged in business during the relevant time period alleged in the complaint, namely the audited periods through August 19, 2005. (PPFOF ¶ 8.) EU signed a collective bargaining agreement ("Agreement") with the Milwaukee and Southern Wisconsin District Council of Carpenters ("the Union") on October 17, 1999. (PPFOF ¶ 9.) The parties dispute the expiration date of the Agreement. EU contends that the Agreement expired on May 31, 2004. (Defendant's Proposed Findings of Fact ("DPFOF") ¶ 6.) The Funds do not offer an alternative expiration date, but rather contend that EU has a history of submitting monthly contributions to the Funds after this purported expiration date. (PPFOF ¶ 10.) EU does not contest that it made payments after May 31, 2004.

The Agreement requires hourly contributions to be made to the Funds. (PPFOF ¶ 17.) Monthly contributions are to be made no later than the fifteenth day of the month following the month worked. (PPFOF ¶ 18.) If these contributions are not paid timely, liquidated damages and interest are assessed as set by the Funds' Trustees. (PPFOF ¶ 19.) The liquidated damages for each Fund were set by the collective bargaining agreement at twenty percent of the unpaid contributions. (PPFOF ¶ 20.) This is identical to the rate set by Congress. (PPFOF ¶ 20; ERISA § 502(g)(2).) The Funds set interest to be applied at the rate of one and one-half percent per month. (PPFOF ¶ 21.) This is also identical to the rate allowed by Congress. ((PPFOF ¶ 21; ERISA § 502(g)(2).) The Agreement and Funds' Trustees also determined that actual attorney fees and costs must be included for any legal action necessary to collect money owed. (PPFOF ¶ 22.)

3

The Union sends its signatory employers notices of annual adjustment to wages and fringe benefit fund contribution rates. (PPFOF ¶ 11.) These rates are determined by the Funds' Trustees. (PPFOF ¶ 12.) Adjustment notices were sent to EU for the time periods June 1, 2003 through May 31, 2004; June 1, 2004 through May 31, 2005; and June 1, 2005 through May 31, 2006 (PPFOF ¶ 13.) EU sent contributions for the periods June through December 2003; January through December 2004; and January through March 2005. (PPFOF ¶ 14.) At times these contributions were untimely. (PPFOF ¶ 14.) The contributions were made according to the rate adjustments established by the Fund's trustees. (PPFOF ¶ 15.)

Despite payments from employers, fund personnel continuously update the status of employers' accounts and calculate and recalculate interest and liquidated damages as payments are made. (PPFOF ¶ 23.)

Audits are scheduled and the auditors' reports are reviewed and circulated among the Trustees, union representatives, and legal counsel. (PPFOF ¶ 24.) The Funds use a self-reporting system for collecting contributions. (PPFOF ¶ 26.) If employers do not file remittance reports or pay contributions as required by the collective bargaining and trust agreements, the Funds perform audits and prepare audit remittance reports from the employer's payroll records. (PPFOF ¶ 27.) Pursuant to the Agreement and the Funds' policies, EU's books and records were examined on four separate occasions. (PPFOF ¶ 28.) Each inspection was by Cynthia Lade. (PPFOF ¶ 28.)

Each audit revealed a delinquency. (PPFOF ¶ 29.) These audited delinquencies were based on EU's own books and records and were agreed upon by the contribution rates determined by the Funds' Trustees. (PPFOF ¶ 30.) After the audits were conducted, at times EU would submit some or all of the outstanding contributions. (PPFOF ¶ 31.)

4

After the third audit through November 19, 2004, EU entered into a Promissory Note and Agreement ("Note") for its delinquencies. The Note was signed on March 17, 2005 by EU's Chief Financial Officer Linda C. Austin. (PPFOF ¶ 32.) The Note required EU to pay $1,000.00 towards its delinquency for six months, and then pay the sum of $373.33. (PPFOF ¶ 33.) Pursuant to the Note, EU made two payments of $1,000.00 and one payment of $3,373.33. (PPFOF ¶ 34.) There remains $1,000.00 owed to the Funds from EU for contributions, interest, and liquidated damages through November 20, 2004. (PPFOF ¶ 35.) Since the filing of the complaint, no payments have been made towards the delinquency, and contributions are still due for the audit billing periods in question. (PPFOF ¶ 36.) Interest and liquidated damages have been assessed by the Funds as a result of EU's failure to submit timely contributions. (PPFOF ¶ 37.)

Taking all audits and payments into account, the total delinquency owed by EU for the aggregate time period through August 19, 2005 in delinquent contributions, liquidated damages, and interest is:

> Building Trades United Pension Trust Fund . . . . . . .. . . . . . . . . . $1,323.55
> Milwaukee and Southern Wisconsin District Council of Carpenter's Health Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,952.73
> Milwaukee and Southern Wisconsin District Council of Carpenters Vacation Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $418.96
> Milwaukee Carpenters JAC Fund . . . . . . . . . . . . . . . . . . . . . . . . $105.16

(PPFOF ¶ 38.)

Of the total outstanding amount of $3,800.40, EU owes $2,592.62 in contributions. (PPFOF ¶ 39.)[1] The Funds have incurred $3,948.58. in attorney's fees and costs in their efforts to collect

---

[1] The plaintiffs' proposed findings of fact did not make clear the exact breakdown of the $3,800.40 allegedly owed by the defendants. Subsequent briefs clarified that the $3,800.40 allegedly due consists of the $1,000 remaining due pursuant to the Promissory Note and Agreement, $2,592.62

5

these amounts through the filing of the plaintiffs' initial brief. (PPFOF ¶ 40.) The Funds allege that they have incurred a total of $5,580.14 in attorney's fees and costs through the filing of the plaintiffs' reply brief. (Plaintiffs' Second Proposed Findings of Fact (PSPFOF ¶ 35).)

## III. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce

_____

in unpaid contributions for the period of November 20, 2004 to August 19, 2005, and $207.78 in interest and liquidated damages for the period of November 20, 2004 to August 19, 2005.

6

affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

ERISA provides that:

7

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

ERISA further provides that:

In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--
(A) the unpaid contributions,
(B) interest on the unpaid contributions,
(C) an amount equal to the greater of--
    (i) interest on the unpaid contributions, or
    (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of the Internal Revenue Code of 1986.

29 U.S.C. § 1132(g)(2).

Interest, liquidated damages, and attorney's fees are mandatory add-ons in successful suits to enforce section 1145. *Central States, S.E. & S.W. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1377 (7th Cir. 1992).

In the case at hand, it is undisputed that EU is an employer that for a period of time was obligated by the collective bargaining agreement to make contributions to the Funds, which are multi-employer plans under ERISA. EU also does not dispute the plaintiffs' calculations of delinquent contributions, interest, and liquidated damages in the amount of $3,800.40, assuming that EU was obligated to make these contributions. The delinquencies were based on a self-reporting

8

system in which delinquent contributions are determined by monthly reports and payroll records submitted by EU. The interest and liquidated damages were calculated based on rates set by Congress. Furthermore, EU does not dispute the plaintiffs' calculations of attorney's fees and costs, which at the time of the plaintiffs' initial brief totaled $3,948.58.

Consequently, if the collective bargaining agreement was in effect for the applicable period through August 19, 2005, and if there are no applicable affirmative defenses for EU, the plaintiffs are entitled to judgment as a matter of law pursuant to section 1145 in the amount of $3,800.40 plus reasonable attorney's fees.

However, the defendant contends that the Agreement expired on May 31, 2004. (Def's Br. at 9.) EU contends that it did not renew the Agreement, but only entered into a promissory note to fulfill its obligations prior to the expiration of the original Agreement. (Def's Br. at 9.) The defendant also presents five affirmative defenses, which claim that the plaintiffs failed to mitigate damages and that other individuals who previously governed EU may be liable for the damages.

## A. Renewal of the Agreement

The plaintiffs contend that EU's continued submission of contributions directly to the Funds' offices for the time period of June 1, 2003 through March 31, 2005 shows EU's acquiescence to the continuing effect of the Agreement. (Pl.'s Br. at 15.) These contributions were paid according to modifications to the rates as established by the Funds' Trustees. Notices of these modifications were sent by the Union to EU. Two of these notices were sent after the stated termination date of May 31, 2004. The plaintiffs contend that as a result of these continued contributions, EU is liable for the audited contributions, liquidated damages, and interest through August 19, 2005. (Pl.'s Br. at 16.)

9

Furthermore, the plaintiffs argue that EU remains liable for contributions, interest, and liquidated damages for all hours its covered employees worked after August 19, 2005. (Pl.'s Br. at 16.)

The defendant argues that it did not sign a renewal of the Agreement, and there has not been any evidence of a renewal of the Agreement. (Def.'s Br. at 9.) EU contends that it was in a state of turmoil when it paid part of the contributions, liquidated damages, and interest, and that the plaintiffs are using a "slight-of-hand" maneuver by construing these partial payments as acceptance of a new Agreement. (Def.'s Br. at 9.)

Article XXV of the Agreement signed by EU on October 27, 1999, relates to the duration of the agreement. The Agreement states, in pertinent part:

> **Section 25.1**  This Agreement shall be binding upon the parties, their successors and assigns, and shall continue in full force and effect until May 31, 2004 provided, however, that written notice of the proposed termination or modification of the contract, by the party desiring to terminate or modify the contract, shall be served upon the other party, on or before February 28th prior to the expiration date, thus insuring a ninety (90) day notice prior to May 31st.  Such notice shall be accepted by both parties as being in full compliance with the notice requirements of the Labor-Management Relations Act of 1947, as amended, and no further notice prior to strike or lockout shall be expected or required.

> **Section 25.2**  Upon failure to meet with the other party for the purpose of collective bargaining upon service of the written notice referred to in Section 25.1, the party so failing to meet is to be deemed to have conceded the changes desired by the party present with respect to wage rates and conditions of employment for the new contract year.

(Pl.'s Ex. 1.)

The signature sheet of the Agreement signed by EU on October 16, 1999, states in pertinent part:

> FOR GOOD AND VALUABLE CONSIDERATION the undersigned hereby agrees to live up to and be bound by all of the terms and provisions of the 1999-2004 Collective Bargaining Agreement in force and effect between ALLIED CONSTRUCTION EMPLOYERS' ASSOCIATION, INC. (ACEA), THE FLOOR

10

COVERERS' ASSOCIATION OF SOUTHEASTERN WISCONSIN, (affiliated with the ACEA) AND THE ASSOCIATED GENERAL CONTRACTORS OF GREATER MILWAUKEE, INC. (AGC) and the MILWAUKEE & SOUTHERN WISCONSIN DISTRICT COUNCIL OF CARPENTERS of the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, a copy of which is attached hereto, to the same effect and for the same period of time as though the undersigned were affiliated with the aforesaid ALLIED CONSTRUCTION EMPLOYERS' ASSOCIATION, INC., THE FLOOR COVERERS' ASSOCIATION OF SOUTHEASTERN WISCONSIN, and ASSOCIATED GENERAL CONTRACTORS OF GREATER MILWAUKEE, INC.

(Pl.'s Ex. 2.)

EU was sent a notice on June 7, 2004 notifying it of a new four-year Agreement which would commence June 1, 2004 and expire on May 31, 2008. The notice stated, in pertinent part:

> You are hereby officially notified that the Milwaukee & Southeast Wisconsin Regional Council of Carpenters . . . has completed negotiations with the Allied Construction Employers' Association, Inc., the Associated General Contractors of Greater Milwaukee, Inc. and the Floor Coverers' Association of Southeast Wisconsin, for a new four-year Agreement commencing June 1, 2004 and expiring May 31, 2008 . . . . Following are the wage and fringe benefit rates for the first year of the Agreement. You will find enclosed, a complete summary of the changes agreed to that will be incorporated into the new Agreement that will be mailed to you for signature as soon as it is printed. You will also find enclosed two copies of the "Letter of Assent" for the new Agreement. Please sign both copies and return one copy to this office within ten days.

(Pl.'s Ex. 4.)

EU was sent another notice in April 2005 notifying it of a change in rate for June 6, 2005 through June 4, 2006. (Pl.'s Ex. 5.)

Although EU has been unable to locate a copy of the new Agreement, the plaintiffs contend that the Union sent EU a copy of the 2004-2008 agreement. (Pl.'s Reply Br. at 10.) However, the plaintiffs do not have evidence that EU signed the new Agreement.

"Nothing in the law of contracts requires that a contract, whether original or modified, must be signed to be enforceable." *Operating Engineers Local 139 Health Benefit Fund v. Gustafson*

*Construction Corp.*, 258 F.3d 645, 649 (7th Cir. 2001). "Acceptance can be effectuated by performance as well as by a signature." *In re: Vic Supply Company, Inc.*, 227 F.3d 928, 932 (7th Cir. 2000) (citing Restatement (Second) of Contracts § 30(2) (1981)).

The plaintiffs have provided no evidence that EU signed either the new Agreement or a "Letter of Assent." At issue, therefore, is whether EU's conduct manifested its acceptance of the 2004-2008 Agreement. For the reasons that follow, I conclude that EU's conduct constituted acceptance of the new Agreement

The plaintiffs cite *Gustafson* to support their position that EU's continued contributions to the Funds constituted acceptance of the new Agreement. (Pl.'s Br. at 15.) In *Gustafson*, the plaintiff union submitted a new contract to the defendant employer, but the defendant never signed the new agreement. 258 F.3d at 649. The original 1991 agreement contained an evergreen clause, which stated that the contract would be automatically renewed if neither side terminated it. *Id*. The original 1991 collective bargaining contract expired in 1993. *Id*. Subsequently, the union billed the defendant for contributions at the changed rate specified in the new, unsigned agreement, and the defendant paid without complaint from 1993 to 1998, although these contributions were often late. *Id*. The court held that the defendant's conduct in paying the modified rates without complaint showed that it acquiesced to the new contract. *Id*. In concluding that there was acceptance of the new contract, the court noted that the increased payments were not trivial, and that the defendant company was small. *Id*. at 650. The court further reasoned that the corporation was not a hapless individual, and would thus unlikely simply fail to notice it was being billed for greater contributions than in the original 1991 agreement. *Id*.

12

The plaintiffs also cite *Carpenters Fringe Ben. Funds v. Able Bros. Constr., Inc.*, 813 F. Supp. 643 (N.D. Ill. 1993), to support their position that continuing contributions after the purported expiration of a contract constitutes acceptance of the new contract. 813 F. Supp. at 650. In *Able Bros.*, the court held that a contract was renewed because the defendant acted in a manner indicating that it believed an agreement was still in effect. *Id.* In particular, the defendant continued to submit the required contributions and statements during the period for which delinquent contributions were claimed, and the defendant consented to an audit of its payroll records. *Id.*

The defendant argues that *Gustafson* is inapplicable because the original Agreement in the case at hand does not contain an evergreen clause. (Def.'s Br. at 10.) EU also argues that the new Agreement is not enforceable because it was not supported by consideration and the acceptance of the modifications were not "manifested with sufficient definitiveness to enable a judge or jury to conclude with reasonable confidence that . . . it was accepted." *Gustafson*, 258 F.3d at 649.

In reply, the plaintiffs point out that the contract in *Able Bros.* did not contain an evergreen clause, but the court nevertheless found acceptance of the contract through conduct. (Pl.'s Reply Br. at 11.) The plaintiffs also contend that the new Agreement was supported by consideration because EU's employees were provided health care coverage, access to a retirement plan, and union-sponsored training. (Pl.'s Reply Br. at 12.) The plaintiffs further argue that definitiveness is shown both by the continued contributions made according to the 2004-2008 Agreement and by EU's paying of its employees at the wage rates established by the new Agreement. (Pl. Reply Br. at 12.)

In my opinion, EU's conduct indicates acceptance of the new Agreement. EU continued to pay contributions past the purported expiration date of the Agreement. These contributions were made after EU completed remittance reports using its payroll records, and were paid based on the

13

changed contribution rates indicated in the plaintiffs' letters informing EU of the new Agreement. From June 2004 through March 2005, EU submitted these contributions on a relatively regular basis, albeit late, with each remittance form completed by EU's Chief Financial Officer. To be sure, EU contends that the Funds deceptively snuck in billings during EU's period of turmoil in order to continue the Agreement, but provides no evidence of this deceptiveness. Moreover, there is no evidence indicating that EU's Chief Financial Officer was unaware of what these billings were for, especially given the nature of the remittance form.

Furthermore, the plaintiffs have submitted evidence indicating that EU was aware of the new Agreement and its obligations. EU received notices of the changes in contribution rates, and appears to have been mailed a copy of the new Agreement. (Scott Affid. ¶ 7; Scott Affid. Ex. 3.) Although EU contends that it did not receive a copy of the new Agreement, it admits that during its time of turmoil each administration neglected, destroyed, or took the organization's files, records, and contracts. (Def.'s Br. at 6.)

EU's letters notifying the Union of its intention to end its training program further indicate that EU was aware of its obligations under the new Agreement. The first of these letters is dated September 20, 2004, and proposes to the Union a discontinuance of the contributions to the Funds. (Def.'s Ex. 4.) This letter is subsequent to the alleged expiration date of the Agreement, to wit, May 31, 2004. Another letter, dated February 18, 2005, is from counsel for the Chicago Regional Council of Carpenters indicating that EU laid off the Carpenters' bargaining unit members and that EU informed the members that they could return if they agreed to work at a lower rate of pay and with company benefits rather than Union benefits. (Def.'s Ex. 6.) The letter informs EU that this was in violation of the collective bargaining agreement, and that members' claims would be prosecuted to

14

fullest extent of the law. (Def.'s Ex. 6.) A final letter from EU dated March 2, 2005, informs the Union that due to financial difficulties, on February 14, 2005, it began to shut down its Construction Training Program and laid off the two remaining members of the bargaining agreement. (Def.'s Ex. 7.) The letter further states that it called back one of the members, Jose Alicea, on February 21, 2005, to complete his current training class, and that he would be paid the same wages and benefits as prior to his lay off on February 14, 2005. (Def.'s Ex. 7.) EU admits that this worker was still part of the training program through at least March 2005. (Def.'s Ex. 7) According to the audit by the Funds, this employee's last hours worked were during April 2005, and the plaintiffs only seek contributions for this work month.

In sum, the plaintiffs have presented evidence that the defendant was aware of and accepted the new Agreement through its performance. EU consistently paid contributions based on the new rates, and allowed the Funds to perform audits for periods past the purported expiration date of the Agreement. Furthermore, EU received notices informing it of the new Agreement and, more likely than not, received a copy of the new Agreement. As evidenced by EU's letters to the Union, the defendant also knew that it was obligated to pay contributions for its employees in the training program after May 31, 2004. These letters do not provide any indication that EU believed the Agreement had expired.

The only evidence that EU presents amounts to mere allegations and denials without factual support. EU presents no evidence to support the proposition that it believed the Agreement had expired, but rather only evidence that it attempted to prematurely terminate the Agreement. EU denies receiving notice of the renewal of the Agreement, but presents no evidence to support this position. The only evidence indicates that EU received both notices and a copy of the new

Agreement. Furthermore, EU presents no evidence to support its argument that the Funds are attempting to "bleed" EU with demands for payments of delinquencies, interest, and penalties year after year after EU stopped the training program. EU admits that the training program was in effect through at least March 2005, and the plaintiffs are only seeking payments for April 2005 for hours worked by one of the union employees. The Funds are not seeking payments for periods after EU ended the training program. The contributions sought by the plaintiffs relate to periods in which the training program was in effect.

In sum, the defendant's conduct constitutes an acceptance of the new Agreement. The defendant complied with the terms of the new Agreement through its contributions to the Funds and payment of wages to union members, and EU indicated an awareness of the Agreement through its letters to the Union notifying it of its intention to end the training program. As such, EU is obligated to pay contributions for the periods in which Union members worked at EU under the training program, specifically the period through August 19, 2005.

**B. Affirmative Defenses**

EU presents five affirmative defenses. The first four contend that EU notified the plaintiffs of their financial difficulties and their need to change the Agreement, but that the plaintiffs refused to mitigate the damages. (Am. Answer at 3.) The final affirmative defense contends that other individuals who governed EU during their frequent, drastic changes in governance may be liable for the failure to comply with contractual obligations. EU presents as evidence of a failure to mitigate the letters sent to the Union evidencing its desire to discontinue the Construction Training Program due to financial difficulties.

16

The plaintiffs contend that ERISA funds, as third party beneficiaries to a labor agreement, are divorced from claims EU may have against the Union. The plaintiffs cite *Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Service, Inc.*, to support their position. 870 F.2d 1148 (7th Cir. 1989). In *Gerber Truck*, the court stated that: "If the contract provides for the commission of unlawful acts, it will not be enforced . . . . If the employer simply points to a defect in its formation -- such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law -- it must still keep its promise to the pension plans." *Id.* at 1153. The court further stated that "the pension or welfare fund is like a holder in due course in commercial law, . . . entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." *Id.* at 1149.

The court in *Gerber Truck* also discussed the Congressional intent of the 1980 amendments to ERISA. In particular, the court noted that:

> "Some simple collection actions brought by plan trustees have been converted into lengthy, costly, and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law -- other than 29 U.S.C. 186.

*Id.* at 1153 (quoting 126 Cong. Rec. 23039 (Rep. Thompson)).

The plaintiffs also cite *Laborers' Pension Fund v. A&C Environmental, Inc.*, in which the court held that *Gerber Truck* forecloses most defenses applicable to the employer and the union, although not the defense of fraud in the execution. 301 F.3d 768 (7th Cir. 2002). Citing *Gerber Truck*, the court stated that with "respect to documents in which employers promise to make contributions to pension funds on behalf of their employees, section 515 allows pension funds to

17

enforce the writings according to their terms 'without regard to understandings or defenses applicable to the original parties [the employer and the union].'"  301 F.3d at 778.

The plaintiffs contend that EU's first four affirmative defenses are barred because they involve the Union, rather than the plaintiffs.  (Pl.'s Br. at 17.)  They argue that based on *Gerber Truck* and its progeny, other than the affirmative defense of fraud in the execution, all defenses raised by an employer which are related to matters between it and the Union do not apply to ERISA funds.  (Pl.'s Br. at 17.)  As to the fifth defense, the plaintiffs contend that their complaint is solely against EU as the corporate entity, and that a separate legal action would need to be filed to impose liability on other individuals.

The plaintiffs have also filed a motion to strike the affirmative defenses.  They claim that the first four affirmative defenses apply to the Union rather than to the plaintiff funds, and that the Union is not a party to the suit.  (Pl. Br. Strike Aff. Def. at 2-3.)  The plaintiffs contend that a defense based on the action or inaction of an organization that is not a party to the lawsuit is immaterial and impertinent.  (Pl.'s Br. Strike Aff. Def. at 3.)  As to the fifth affirmative defense, the plaintiffs claim that it is also immaterial and impertinent because the other individuals who may be liable are not parties to the lawsuit.

The basis for the plaintiffs' motion to strike is one of the defendant's admissions to the First Set of Requests for Admission, Interrogatories and Requests for Production of Documents.  Specifically, Request for Admission number 9 states: "In paragraphs 1 through 4 of your Affirmative Defenses, the term "Plaintiffs" refers to the Milwaukee and Southern Wisconsin District Council of Carpenters, now known as the Chicago Regional Council of Carpenters."  (Menzel Affid. at ¶ 3.)  EU's answer to the request was "Yes."  (Menzel Affid. at ¶ 5.)

The defendant argues that their answer to the Request for Admission was based on their best information and belief at the time, and that based on their correspondences with the Union their belief was that this was the plaintiff of the suit. (Def.'s Resp. Strike Aff. Def. at 4.) Furthermore, the defendant argues that individual members of their previous Board of Directors can be held liable due to ultra vires activity through a "piercing of the corporate veil." (Def.'s Resp. Strike Aff. Def. at 6.)

To be sure, the defendant has admitted in the Request for Admission that it believed that the Union was responsible for the failure to mitigate. And given that the correspondences involving the Agreement were between the Union and EU, it is conceivable that it mistakenly believed that the Union was a party to the suit. It is also conceivable that EU mistakenly believed the Funds and the Union were the same entity. Consequently, the motion to strike the affirmative defenses one through four will be denied. However, it is unclear whether, through its affirmative defenses, EU is arguing that the Union's failure to mitigate is applicable to the Funds' suit, or whether the Funds themselves failed to mitigate. As such, the court will address both issues.

The first issue is whether EU can raise an affirmative defense applicable to the Union in a suit by the Funds. As shown from *Gerber Truck* and its progeny, funds generally can enforce an agreement without regard to defenses applicable to the employer and the union. The only exception explicitly mentioned by the Seventh Circuit is fraud in the execution. As explained by the court in *Laborers' Pension Fund,* this exception exists because a contract formed through fraud in the execution never had any legal effect. 301 F.3d at 780. This result is consistent with the notion that a pension fund is like a holder in due course, as fraud in the execution is a viable defense to collection efforts by a holder in due course. *Id.*

19

In the case at hand, a defense of failure to mitigate by the Union is inapplicable to the Funds suit. A failure to mitigate does not render a contract void as in fraud in the execution, and furthermore appears to be a defense only applicable to the employer and Union. As discussed in *Gerber Truck*, the fund is allowed to collect without regard to defenses between the employer and Union.

The second issue is whether EU can prove that the Funds themselves failed to mitigate. It is unclear whether plaintiffs have a duty to mitigate damages under ERISA, although some courts have held that this affirmative defense is applicable to plaintiff funds in ERISA cases. *See, e.g., Iron Workers' Local No. 25 Pension Fund v. Klassic Servs., Inc.*, 913 F. Supp. 541, 546 (E.D. Mich. 1995). However, even assuming that the Funds had some duty to mitigate, EU has failed to provide evidence indicating that they knew of EU's desire to terminate the Agreement, and that they failed to mitigate damages.

The only correspondence relating to EU's troubled financial situation was between EU and the Union, and even these letters indicate EU's willingness to still pay contributions for the one remaining union worker. The defendant argues that the Funds continued to seek funds from an employer that was delinquent from the beginning, as revealed through multiple audits. However, EU subsequently filled out remittance forms and made contributions to the Funds relatively consistently, albeit late. EU paid all of the contributions, with the exception of April 2005, the only month of known delinquency. In regards to the promissory note, EU paid all of the note except for $1,000.00. It is unclear how the Funds could have mitigated these damages, which were relatively minor in relation to EU's previous payments. Furthermore, as a third party beneficiary, the Funds did not have

20

the power to terminate an Agreement between EU and the Union. The Funds were merely enforcing the terms of the Agreement.

The defendant argues that the Funds kept billing EU in order to use it as a cash cow with which to extract delinquencies, penalties, interest, liquidated damages, attorney's fees, and costs. (Def.'s Br. at 13.) Although the Funds have subsequently added liquidated damages and interest, these rates were set by Congress, and the damages were accessed based on the Funds' normal operating procedures for delinquent payments. There is no evidence that the Funds were attempting to pile up damages. Of the $3,800.40 sought by the plaintiffs, only $207.78 is from liquidated damages and interest. The remaining amount derives from the $1,000.00 left from the promissory note and the $2,592.62 in unpaid contributions for the period of November 20, 2004 to August 19, 2005.

In sum, the defendant has failed to present evidence to establish the affirmative defense of failure to mitigate. The defendant has presented no evidence indicating why Funds under ERISA have a duty to stop collection of payments from employers which make untimely contributions and to eliminate standard liquidated damages and interest fees.

As to the defendant's fifth affirmative defense, EU has not provided any evidence as to the identity of other individuals who may be liable, or why they may be liable. As these individuals are not parties to the suit, this defense is immaterial.

## B. Promissory Note

The plaintiffs also contend that EU's performance pursuant to the Note from March 17, 2005, indicates its recognition and acceptance of the Note. (Pl.'s Br. at 16.) The Note was for the delinquency to the plaintiff Funds as known through audits conducted through November 19, 2004,

and was signed by EU's Chief Financial Officer. EU submitted three payments pursuant to the Note, and there remains $1,000.00 owed pursuant to the Note for contributions, interest, and liquidated damages through November 20, 2004.

The defendants do not dispute that it entered into this promissory note and made multiple payments towards this note. EU also does not dispute that there remains $1,000.00 owed pursuant to the Note. As such, given that EU signed and made payments toward the Note, it cannot deny the effectiveness or obligations under the Note.

## C. Breach of Fiduciary Duty

The defendant also asserts that the plaintiffs failed in their fiduciary duty to the Funds by refusing to terminate a contract which was no longer viable. (Def.'s Br. at 9.) However, the defendant lacks standing to make such a claim.

ERISA provides that "[a] civil action may be brought - by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409." 29 U.S.C. §1132(a)(2). Section 409 relates to liability for a breach of fiduciary duty. Because an employer is not named as a party who may bring a suit under § 409, the defendant lacks standing to assert a claim that the plaintiffs breached their fiduciary duties.

## D. Prospective Relief

There is one final matter. The plaintiffs seek an undetermined additional amount to be established through a not-yet conducted audit of the defendant's payroll books and records of all contributions, interest, and liquidated damages owed for the time period of August 20, 2005 through the present. The court denies the plaintiffs' request for such relief. Should some future audit

22

disclose additional amounts allegedly due to the plaintiffs, they may file another suit to collect the same.

### V. Conclusion

In conclusion, and for all of the foregoing reasons, the plaintiffs' motion for summary judgment will be granted. The defendant has failed to provide sufficient evidence to rebut the plaintiffs' evidence (and thereby create an issue of fact) that EU was aware of the new agreement and accepted the agreement through its conduct in continuing to make contributions to the Funds. The defendant has also failed to provide sufficient evidence to rebut the plaintiffs' evidence (and thereby create an issue of fact) that EU entered into and is bound by the terms of the promissory note. Furthermore, the defendant has not provided evidence that the Funds failed to mitigate damages.

**NOW THEREFORE IT IS ORDERED** that the plaintiffs' motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion to strike the defendant's affirmative defenses be and hereby is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of the plaintiffs in the amount of $3,800.40, consisting of the $1,000 remaining due pursuant to the Promissory Note and Agreement, $2,592.62 in unpaid contributions for the period of November 20, 2004 to August 19, 2005, and $207.78 in interest and liquidated damages for the period of November 20, 2004 to August 19, 2005;

**IT IS FURTHER ORDERED** that the plaintiffs be awarded $5,580.14 in attorneys fees and costs;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

23

**SO ORDERED** this <u>14th</u> day of November 2006, at Milwaukee, Wisconsin.


<u>/s/ William E. Callahan, Jr. </u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge